******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# ALINA LEONOVA *v.* STANISLAV LEONOV
## (AC 42539)

Keller, Prescott and Devlin, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court dissolving his marriage to the plaintiff and from the trial court's granting of the plaintiff's motions for attorney's fees. *Held*:

1. The plaintiff could not prevail on his claim that the trial court abused its discretion by improperly basing the supplemental alimony awarded to the plaintiff on the defendant's gross, rather than net, bonus income, as the court had ample evidence at its disposal to adequately inform it as to the defendant's financial status with respect to his net bonus income; the trial court did not state that it relied on the party's gross earnings to form the basis of its order, the record demonstrated both parties' net available income, including the defendant's base pay, and it was apparent that the court intended its supplemental alimony order to be a function of the gross bonus income, which was a convenient and economical method of calculation, and was distinguishable from the court basing its order on the bonus gross income, especially as the court did not use gross income to calculate the periodic alimony order or the monthly and supplemental child support orders.

2. Contrary to the defendant's claim, the trial court did not act in excess of its statutory (§ 46b-81) authority applicable to dissolution proceedings by ordering the parties to establish and to contribute to educational savings plans, as the court properly exercised its authority pursuant to the applicable statute (§ 46b-56) to secure contemplated future educational support orders by requiring each party to restore one half of the gift money that had been donated to the parties' two children from their grandmother and to protect it for their future use; the court's order to establish the plans was eminently fair, as both parties were ordered to contribute equally to their creation after they had used the children's gift money to renovate a home that the children will never occupy, although the defendant claimed that § 46b-81 was limited to orders regarding property division and did not permit the court to order future investment decisions for the parties, the trial court did not exceed its authority, as § 46b-81 was inapplicable, and that under the applicable statutes (§§ 46b-56 and 46b-84), the court was authorized to provide security for the enforcement of a future educational support order when it retained jurisdiction to make an order providing the children with an educational expectancy and, by ordering the establishment of two new savings plans, the court was not distributing marital property from one spouse to the other, but securing funds for the children's future educational needs.

3. The trial court erred in finding the defendant in contempt for violating the automatic orders in effect, pursuant to the relevant rule of practice (§ 25-5), by renting a seasonal ski lodge, as it was undisputed that the plaintiff failed to file a written motion for contempt regarding the rental of the ski lodge: the defendant had no notice that he was facing a contempt finding with respect to the rental of the ski lodge, as the plaintiff's motion for contempt alleged only that the defendant violated the automatic orders in purchasing cryptocurrency; furthermore, the trial court did not abuse its discretion in ordering the defendant to reimburse the plaintiff for one half of the cost the defendant incurred in renting the ski lodge and to reimburse the plaintiff for one half of the loss that he incurred as a result of a cryptocurrency investment he made after the imposition of the automatic orders, as the record sufficiently demonstrated that, contrary to the defendant's claims, the rental of the ski lodge and the investment in the cryptocurrency were not made in the usual course of business as provided in the exception to Practice Book § 25-5 for the transfer or disposal of marital property; the defendant admitted that he did not request permission from the plaintiff prior to purchasing the cryptocurrency, that he did not have accounts to make that type of investment prior to the commencement

of the dissolution action, he did not discuss the rental of the seasonal ski lodge with the plaintiff, and, although the parties took vacations together during their marriage, the plaintiff did not ski, the parties never rented a ski lodge during their marriage, and the defendant shared the seasonal ski lodge with others; moreover, even in the absence of a contempt finding, a trial court has the authority to compensate a spouse for losses caused by a violation of the automatic orders by adjusting the distribution of marital assets in the injured spouse's favor.

4. The trial court did not abuse its discretion by failing to attribute an earning capacity to the plaintiff in determining alimony and child support, the record having sufficiently supported the court's determination to base its awards of child support and alimony on the plaintiff's actual income at the time of the dissolution, which it found to be zero, as such determination was not contrary to law; the court expressly stated that it had considered all of the relevant statutes before rendering its judgment, and the trial court has broad discretion in varying the weight placed on each statutory criterion under the circumstances of each case.

5. The trial court did not err in awarding the plaintiff attorney's fees for representation during the marital dissolution proceedings, postjudgment matters, and this appeal, as the trial court properly exercised its broad discretion in granting the plaintiff's motions for attorney's fees; this court, in affording the trial court every reasonable presumption in favor of the correctness of its decision, found that the trial court could have relied on evidence relevant to each statutory (§ 46b-82) criterion as it applied to both parties, and that not awarding the plaintiff attorney's fees would have had the effect of undermining its other financial orders.

Argued June 15—officially released November 17, 2020

*Procedural History*

Action for the dissolution of marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford and tried to the court, *Hon. Michael E. Shay*, judge trial referee; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court; thereafter, the court, *Hartley Moore, J.*, granted the plaintiff's motions for attorney's fees and granted certain other relief, and the defendant filed an amended appeal. *Reversed in part*; *further proceedings*.

*Campbell D. Barrett*, with whom were *Johanna S. Katz*, and, on the brief, *Jon T. Kukucka*, for the appellant (defendant).

*Charles D. Ray*, with whom, on the brief, was *Angela M. Healey*, for the appellee (plaintiff).

*Opinion*

KELLER, J. The defendant, Stanislav Leonov, appeals from the judgment of the trial court, dissolving his marriage to the plaintiff, Alina Leonova, which included a finding of contempt against the defendant, and from two postjudgment orders awarding the plaintiff attorney's fees incurred in connection with postdissolution proceedings and her defense of this appeal. On appeal, the defendant claims that the trial court (1) abused its discretion by improperly basing supplemental alimony awarded to the plaintiff on the defendant's gross, rather than net, bonus income, (2) acted in excess of its statutory authority when it ordered the parties to establish and to contribute to education savings plans established pursuant to 26 U.S.C. § 529 (§ 529 plans) for the benefit of each of the two minor children, (3) acted in excess of its statutory authority when it found the defendant in contempt for an alleged violation of the automatic orders set forth in Practice Book § 25-5, despite the fact that there was no contempt motion pending, (4) abused its discretion when it found the defendant in contempt for two violations of the automatic orders where the defendant's financial expenditures fell within the "usual course of business" exception to the rule, (5) abused its discretion by failing to attribute an earning capacity to the plaintiff in determining alimony and child support, and (6) in violation of the directive of General Statutes § 46b-62 (a) and relevant decisional law, improperly awarded the plaintiff attorney's fees for representation during the marital dissolution proceedings, postjudgment matters and this appeal.[1] We agree with the defendant's third claim only. Accordingly, we reverse the judgment of dissolution only with respect to one of the contempt findings, and remand the case to the trial court with direction to vacate its finding that the defendant was in contempt with respect to one of the violations of the automatic orders alleged by the plaintiff. We affirm the judgment and postjudgment orders of the court in all other respects.

The plaintiff brought the underlying dissolution action against the defendant in 2017. A contested trial took place in December, 2019, during which both parties were represented by counsel. The following undisputed facts, or facts as found by the trial court, and additional procedural history are relevant to this appeal. The plaintiff and the defendant were married in New York, New York on March 10, 2006. Both parties emigrated as children from regions of the former Soviet Union, the defendant from Ukraine and the plaintiff from Azerbaijan. Each is a naturalized citizen and is fluent in English. There are two minor children issue of the marriage who, at the time of the judgment of dissolution, were ages four and three. From the time that the parties separated in March, 2017, until the time of the dissolution, the plaintiff resided in a condominium owned by

the parties at 25 West Elm Street in Greenwich (Greenwich condominium). The children resided primarily with the plaintiff.[2] The defendant resided in an apartment in White Plains, New York.

The defendant, at the time of the dissolution, was thirty-nine years old and in good health. He has a degree in computer science and has worked steadily throughout the marriage. For the six years of marriage preceding the divorce, he had been employed by Viking Global Investors in Greenwich as a team leader in quantitative development. He earned an annual base salary of $400,000 and also regularly received an additional annual discretionary bonus. In 2017, he received a gross bonus of $508,500 and was expecting to receive a gross bonus of $550,000 for 2018.[3]

The plaintiff, at the time of the dissolution, was thirty-five years old and in general good health, but has vision problems and a serious hearing deficit, which would require further surgery to partially restore her hearing. She had earned a master's degree in business administration from Fordham University while working full-time earlier in the marriage, but had not been fully employed outside of the home since 2012. She considered herself a full-time homemaker, although she sporadically earned money during the marriage. In one instance she performed some part-time bookkeeping, earning between $4000 and $5000, and in another instance she earned several hundred dollars related to her photography hobby.

The principal assets of the parties included two properties in Connecticut and a cooperative apartment in Brooklyn, New York (Brooklyn co-op). The parties stipulated that one of the Connecticut properties, the jointly owned Greenwich condominium occupied by the plaintiff, had a fair market value of $580,000. There was a mortgage on that property in the amount of approximately $416,000. The parties also owned a larger home at 215 Riverside Avenue in Greenwich (Riverside house), which they had purchased during the marriage and renovated. On each of their financial affidavits, the parties indicated that the Riverside house had a fair market value of $2.5 million with an outstanding mortgage of approximately $1,467,000. At trial, the defendant complained that the plaintiff spent far too much money on the renovations.[4] The plaintiff testified that if she had known that the family was not going to occupy the Riverside house when the renovations were complete, she never would have spent so much.[5] To complete the renovations, the plaintiff had borrowed $50,000 from her mother, and both parties acknowledged that the $60,000 that the plaintiff's mother had gifted to the parties' children, $30,000 to each child at the time of the child's birth, also was spent for that purpose. The parties also jointly owned the Brooklyn co-op, which was under a contract for sale for $290,000. There was

approximately $195,000 of equity in that property.

Other marital assets included several retirement accounts, three belonging to the defendant and one belonging to the plaintiff. The unspent balance of the defendant's 2017 net bonus, approximately $63,000, was being held in escrow in one of the checking accounts pursuant to a court order.[6]

The plaintiff also held an interest in an apartment and an apple orchard in Azerbaijan, which she estimated had a combined value of $50,200. The defendant claimed no interest in either. Both parties, as of the time of the dissolution, had accumulated a substantial amount of credit card debt, as well as debts to family and friends.

The court, in its factual conclusions, was more critical of the defendant than of the plaintiff, noting, as follows: "During the pendency of the case, [the defendant] received an annual bonus for 2017, most of which he spent, much of it on credit card debt. As a result, the court entered pendente lite orders, among other things, freezing the unspent balance as well as other orders. Moreover, since the separation, his spending has been uncharacteristically lavish for, among other things, meals and travel. . . . The [plaintiff] told the court that the pattern throughout the marriage was to 'save and invest,' adding that 'this is not my husband.' The [defendant] did not dispute the marital saving and spending patterns. By way of contrast, in 2018 he only paid the [plaintiff] $12,500 for support for the first half of the year and nothing since. However, since the filing of the complaint, among other things, without consulting the [plaintiff] or seeking her permission, he made a large, and losing, investment in some alternative currencies (so-called 'cryptocurrencies'), like Bitcoin. In January, 2018, he invested $39,000 in these currencies and later sold them for a $22,000 loss. While the [defendant] has maintained an investment account, it was clear from his testimony that he had never made such an investment before. More recently, again without permission, he removed $10,000 from [a] checking account to rent a ski lodge for the upcoming season. . . .

"[The defendant] testified that the parties had 'grown apart' and that for a year there had been 'no emotional or physical relationship or intimacy.' The [defendant] struck the court as somewhat insincere, the evidence supporting a finding that for years he has been carrying on a long time extramarital affair with a person he met on a ski trip. The [plaintiff] told the court that she was surprised to first find out about the [defendant's] affair when he posted a picture of the girlfriend on social media and it was brought to her attention by a friend. [The plaintiff] believed that the marriage could be saved. Adding to [the plaintiff's] consternation was the fact that in April, 2016, [the defendant gave the plaintiff] a gift of an expensive diamond ring, which he claimed

cost $50,000. She values the ring at $25,000."

In making its findings, the court noted that it had considered all relevant statutory provisions affecting its financial orders.[7] It found that both parties had contributed to the breakdown of the marriage "in some fashion," but that the defendant's actions were the primary cause.

With respect to its January 10, 2019 orders, which were incident to the judgment of dissolution and are the subject of this appeal, the court indicated that it had reviewed the affidavit of attorney's fees submitted by the plaintiff's attorney dated December 20, 2018, and that the fees incurred by the plaintiff were fair and reasonable, and that "to require the [plaintiff], who has at present a minimal earning capacity and the responsibility for the two minor children, to pay these fees from her portion of the martial assets awarded to her . . . would undermine the purposes of the same and that it would be fair and equitable for the [defendant] to pay a portion of the same." (Citation omitted.) The court ordered the defendant to pay $40,000 to the plaintiff's attorney for legal fees incurred by the plaintiff within thirty days of the date of the judgment. The plaintiff was to pay the balance of her legal fees, and the defendant was responsible for his own.

The court ordered that, commencing February 1, 2019, the defendant was to pay to the plaintiff the monthly sum of $6200 for periodic alimony until the death of either party, the remarriage of the plaintiff, her cohabitation or living together as defined by General Statutes § 46b-86 (b), or until June 30, 2029, whichever shall sooner occur. In addition to the foregoing, commencing with the bonus that the defendant was to receive for the year 2019 and succeeding years, until termination of alimony for whatever reason, the court ordered the defendant to pay to the plaintiff, as additional periodic alimony, a sum equal to 20 percent of his gross bonus award up to and including $250,000, and, thereafter, a sum equal to 10 percent of his gross bonus award up to and including a ceiling of $750,000 (supplemental alimony award). The defendant was required to make the supplemental alimony award payment within one week of receipt of the bonus and to include with the payment a copy of the pay slip outlining the gross amount and any deductions therefrom. Except for the circumstances warranting termination of alimony stated in the order, the court made the term of the periodic alimony otherwise nonmodifiable, and further ordered that the amount of periodic alimony would be nonmodifiable by the defendant where the sole basis for modification is annual gross earnings of the plaintiff of $35,000 or less.[8]

In light of testimony that gifts of $30,000 to each of the children from the plaintiff's mother had been used to pay for some of the costs of renovating the Riverside

house, each of the parties was ordered to jointly contribute $30,000 to a separate § 529 plan for each minor child, to be established by the plaintiff for their benefit. Specifically, the court ordered these funds to be deducted from each party's share of the net proceeds from the defendant's 2018 bonus. To the extent that the court's order also suggests that these funds be set aside from the proceeds of the sale of the Riverside house, we infer that the court intended to derive the $30,000 contributions into the new § 529 plans by either of these two means. To wit, either from the Riverside house net sale proceeds or from the defendant's 2018 net bonus proceeds. Neither party claims that the amount of the contribution that the court required from each of them was more than $30,000. The plaintiff was ordered to serve as the fiduciary for both accounts. Until said accounts are established, the sum of $60,000 from the net proceeds of the 2018 bonus was to be paid to and held in escrow in the plaintiff's attorney's trustee account. Any § 529 plans previously established by the defendant were ordered to remain in full force and effect.

The court also addressed a claim made by the plaintiff during the trial that she be reimbursed for losses resulting from the defendant's breach of the automatic orders based on his cryptocurrency investment and his rental of the ski lodge. The plaintiff previously had filed a motion for contempt against the defendant for his violation of the automatic orders based on his cryptocurrency investment, but she did not file a motion for contempt alleging that his rental of the ski lodge was also such a violation. The court ordered the defendant to pay to the plaintiff $16,000 from his share of the net proceeds of his 2018 bonus to offset his violation of these two automatic orders.

Although, in the present appeal, the defendant does not challenge the court's distribution of marital assets, we will review the court's orders in this regard because they are relevant to our analysis of whether certain other financial orders that are the subject of this appeal constitute an abuse of the court's discretion.

The plaintiff was allowed to retain her interest in the assets located in Azerbaijan.

The net proceeds of the sale of the Brooklyn co-op after payment of any mortgage, taxes and liens, as well as closing costs, were ordered to be divided equally by the parties.

The Greenwich condominium, in which the plaintiff and the children reside, was awarded to her, subject to any existing indebtedness after the defendant brought the mortgage, the real estate taxes and the homeowners insurance current from his share of the division of his 2018 bonus. The defendant was ordered to quitclaim his interest in this property to the plaintiff

within thirty days of the date of the dissolution and to make these payments current within one month of the date of the dissolution. After the defendant quitclaimed his interest in the condominium to the plaintiff, she was ordered to be solely responsible for the payment of the balance of the mortgage, the insurance and the real estate taxes and to indemnify and to hold the defendant harmless therefrom. She further was ordered to use her best efforts to remove the defendant's name from the existing mortgage within five years.

The court ordered the Riverside house to be listed for sale, with the net proceeds of the sale to be divided equally between the parties. The plaintiff was ordered to reimburse the defendant from her share of the proceeds for carrying costs on the home that he was ordered to pay from January 1, 2019, until it is sold. The defendant also was ordered to immediately bring the mortgage, the real estate taxes and the homeowners insurance current from his share of the division of his 2018 bonus as of the date of the judgment.

The balances in three checking accounts were ordered to be divided equally. These accounts included a Citibank account containing the $63,000 escrowed balance of the defendant's 2017 bonus income, a Chase Bank account containing $11,000 and an HSBC checking account.[9]

The parties were allowed to retain the balances in their individual 401 (k) plans and retirement accounts, except that one Fidelity 401 (k) plan, held by the defendant and worth $423,184, was ordered be divided, 60 percent to the plaintiff and 40 percent to the defendant by means of a qualified domestic relations order (QDRO). The plaintiff's Fidelity 401 (k) plan was worth $210,000. The defendant was allowed to retain in its entirety a Viking 401 (k) plan worth $167,139 and a Fidelity individual retirement account, worth $5779.

The parties each were ordered responsible for the cost of their leased automobiles and for any debt on their respective financial affidavits not addressed in the court's memorandum of decision.[10] Household furnishings, except for the children's furniture, which was to remain in the plaintiff's possession, were ordered to be divided equally. Each party was allowed to retain his or her clothing, personal effects, E-Trade accounts,[11] and jewelry, which permitted the plaintiff to keep the diamond ring she claimed was appraised at $25,000. The defendant was allowed to retain his Viking Hedge Fund account, worth approximately $7200.

After the judgment was rendered, the defendant filed this appeal on January 30, 2019. On February 1, 2019, the plaintiff filed two motions for counsel fees, in which she sought legal fees for representation relevant to certain postdissolution motions and to defend this appeal. On April 8, 2019, after an evidentiary hearing, the court,

*Hartley Moore*, *J.*, granted both motions after finding that the defendant "was able to obtain significant funds for a retainer for new counsel to represent him postjudgment," and that he had "rented an expensive ski house for the season and [had] started paying the alimony and child support order in February, 2019. The plaintiff has nominal income from part-time employment and has the primary responsibility of caring for two very young children. Moreover, the plaintiff was awarded counsel fees in the underlying dissolution of marriage."[12] On April 24, 2019, the defendant amended his appeal to seek reversal of these April 8, 2019 orders. Additional facts and procedural history will be set forth as necessary.

I

## SUPPLEMENTAL ALIMONY AWARD

The defendant's first claim is that the court abused its discretion by improperly basing the supplemental alimony awarded to the plaintiff on the defendant's gross, rather than net, bonus income. We disagree.

The applicable standard of review of this financial order is abuse of discretion. "In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Medvey* v. *Medvey*, 98 Conn. App. 278, 281, 908 A.2d 1119 (2006); see id. (abuse of discretion standard applied to claim court improperly relied on gross, rather than net, income of husband in modifying alimony).

As indicated previously in this opinion, the court entered the following order of supplemental alimony: "[C]ommencing with the bonus [the defendant] receives for the year 2019 and succeeding years, until termination of alimony for whatever reason, he shall pay to the [plaintiff, as additional] periodic alimony, a sum equal to 20 percent of his gross bonus award up to and including $250,000; and thereafter a sum equal to 10 percent of his gross bonus award up to and including a ceiling of $750,000.[13] Said payment shall be made within one week of receipt of the bonus and shall be accompanied by a copy of the pay slip outlining the gross amount and any deductions therefrom." (Footnote added.)

The court had before it the financial affidavits and worksheets of both parties filed pursuant to the Child Support and Arrearage Guidelines (child support guidelines), which had been filed immediately prior to trial as required by Practice Book § 25-30 (e). The defendant, however, did not disclose his bonus income, gross or net, in either this financial affidavit or in his child support guidelines worksheet. He only indicated his weekly income from his base salary. He did, however, testify that, before the trial concluded, he was anticipating

receiving from his employer a gross bonus of $550,000 for the year 2018. He acknowledged that his income from salary and bonus for the year 2016, the last year he had filed a tax return, was $813,644. The defendant further stated that he had been on a trajectory where his bonus income exceeded his annual base salary.

The court had as evidence the parties' joint tax returns for the years 2014 through 2016 and a list of the expenditures the defendant had made from the net proceeds of his 2017 bonus. There was a balance of $63,000 remaining from the 2017 bonus. Also in evidence was the defendant's 2017 bonus payroll statement, including deductions, which showed a gross bonus of $508,500, or $9778.85 weekly, as well as financial affidavits, previously filed by the defendant on January 25 and April 6, 2018, which indicated a net weekly income, including bonus payments, of nearly $10,000 a week after his stated deductions, some of which are not legally mandated, such as his contributions into his retirement accounts.

Although our case law consistently affirms the basic tenet that support and alimony orders must be based on net income, "the proper application of this principle is context specific. . . . [W]e differentiate between an order that is a function of gross income and one that is based on gross income. . . . [T]he term based as used in this context connotes an order that only takes into consideration the parties' gross income and not the parties' net income. Consequently, an order that takes cognizance of the parties' disposable incomes may be proper even if it is expressed as a function of the parties' gross earnings." (Citation omitted; internal quotation marks omitted.) *Procaccini* v. *Procaccini*, 157 Conn. App. 804, 808, 118 A.3d 112 (2015).

This court previously has overlooked the failure of the trial court to make a finding as to a party's net income, as in the present case, with respect to the defendant's net bonus income. We have concluded that such an omission does not compel the conclusion that the court's order was improperly based on gross income if the record indicates that the court considered evidence from which it could determine a party's net income, and it did not state that it had relied on the party's gross earnings to form the basis of its order. See *Hughes* v. *Hughes*, 95 Conn. App. 200, 207, 895 A.2d 274, cert. denied, 280 Conn. 902, 907 A.2d 90 (2006).

In *Kelman* v. *Kelman*, 86 Conn. App. 120, 123, 860 A.2d 292 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1079 (2005), this court rejected a similar claim on the ground that, although the trial court, in its decision, made reference to the parties' gross incomes, it did not expressly state that it was relying solely on gross earnings in framing its order. The trial court in the present case, like the trial court in *Kelman*, stated that it took into account all of the relevant statutes, the

testimony of the parties, and the evidence presented, which included evidence of the defendant's actual net bonus income, including a payroll statement from 2017 reflecting his most recent annual net bonus payment. The court found that based on the parties' financial affidavits, the defendant's net available income from his *base* pay was $4462 per week, or $19,187 per month, and the plaintiff's net available income was $0 per week. The court relied on these net findings as the basis for its monthly child support and alimony awards. The court also based its supplemental child support order on a percentage of the defendant's net annual bonus, after allowing for the mandatory deductions listed in the child support guidelines regulations. It further indicated that it was aware that "alimony and child support orders must be based upon the net income of the parties," and did not distinguish between periodic and supplemental orders in making this statement.

It is apparent that the court intended its supplemental alimony order to be a function of the gross bonus income, which is a convenient and economical method of calculation.[14] This order is distinguishable from the court basing its order on the bonus gross income, especially in light of the fact that the court did not use gross income to calculate the periodic alimony order or the monthly and supplemental child support orders.[15] Because the court had ample evidence at its disposal to adequately inform it as to the defendant's financial status with respect to his net bonus income, we conclude that the court did not abuse its discretion in making its supplemental alimony order a function of the defendant's future gross bonus income.

## II

### ORDER TO ESTABLISH § 529 PLANS

The defendant's second claim is that the court acted in excess of its statutory authority by ordering the parties to establish and to contribute to an education savings plan established pursuant to 26 U.S.C. § 529, for the benefit of each of the two minor children.[16] The defendant argues that the court had no authority to issue such an order because General Statutes § 46b-81, which pertains to property divisions, does not afford the court the right to make future investment decisions for the parties; rather, its authority is limited to the ability to distribute the marital property from one spouse to the other or to order its sale.

As we explained previously in this opinion, prior to the court-ordered equal distribution of the net proceeds of the defendant's 2018 bonus, each party was ordered to contribute the sum of $30,000 to a separate § 529 plan for each child, to be established by the plaintiff. We disagree with this claim and conclude that the court imposed this order to secure future educational support to the children, which is within its authority in a dissolu-

tion proceeding, pursuant to General Statutes § 46b-56.

The following additional facts apply to this claim. During the trial, the court heard testimony from both the plaintiff and the defendant as to their expenditure of $30,000 in gifts that the plaintiff's mother had donated to each of the minor children at the time of their births. The plaintiff testified that, in addition to loans that she had received from her mother, she had used the $60,000 gift amount to pay for part of the renovation work to the Riverside house. She claimed that she and the defendant had agreed that this amount would eventually be repaid to the children. In closing argument, her counsel requested that the court restore this money to the children. The defendant testified that the plaintiff told him that these gifts from his mother-in-law were intended for the children and had been used instead for the renovations, although he claimed to have no proof of the gifts or the fact that they were used for the renovations. The court credited the plaintiff's testimony and, in its financial orders, ordered each of the parties to place $30,000, to be deducted from each party's share of one of two distributed marital assets, into two § 529 plans,[17] one for each of the children, with the plaintiff to serve as trustee of those plans.

The parties disagree on the applicable standard of review. The plaintiff argues that the standard of review should be abuse of discretion, but the defendant correctly argues that "the court's authority to transfer property appurtenant to a dissolution proceeding requires an interpretation of the relevant statutes. Statutory construction, in turn, presents a question of law over which our review is plenary." (Internal quotation marks omitted.) *Rosato* v. *Rosato*, 77 Conn. App. 9, 18, 822 A.2d 974 (2003).

We further note that, "[a]lthough created by statute, a dissolution action is essentially equitable in nature. . . . The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances [that] arise out of the dissolution of a marriage." (Internal quotation marks omitted.) *O'Brien* v. *O'Brien*, 326 Conn. 81, 103, 161 A.3d 1236 (2017).

Section 46b-81 (a) provides in relevant part: "At the time of entering a decree annulling or dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either spouse, when in the judgment of the court it is the proper mode to carry the decree into effect. . . ." We have held that "[i]t is plain from [this] statute that while the court has the authority to pass title of real property from one spouse to another or to a third party at the time of marital dissolution, the court's authority to transfer any part of each spouse's estate is limited to transfers between

spouses." *Rosato* v. *Rosato*, supra, 77 Conn. App. 19.

The defendant also argues that, to the extent that the court intended its order to constitute a form of postsecondary educational support, the court's order violates General Statutes § 46b-56c (c)[18] because the court expressly stated that it was reserving jurisdiction to enter an educational support order at a later date for the benefit of the two children and, therefore, never undertook an analysis of the statutory factors in § 46b-56c (c). Finally, the defendant claims that, to the extent that the court intended its order to constitute postmajority child support, its award did not comply with General Statutes § 46b-66.[19]

The plaintiff counters that the defendant's arguments ignore the totality of the factual circumstances surrounding the order creating the two new § 529 plans and that, given its broad discretionary authority, the court properly restored and preserved money donated to the children that had been appropriated by the parties for another purpose during the marriage.[20] In doing so, the court was aware from the evidence that the parties previously had created several § 529 plans for the benefit of their children. We agree with the plaintiff that the court did not exceed its authority under § 46b-81. We conclude that § 46b-81 is inapplicable, and that pursuant to General Statutes §§ 46b-56 and 46b-84, the court is authorized to provide security for the enforcement of a future educational support order when it retains jurisdiction to make such an order providing the children with an educational expectancy.[21]

We do not agree with the defendant that the court's order that each of the parties deposit $30,000 into two new § 529 plans was an improper order under § 46b-81 because it required the parties to distribute joint marital funds to someone other than the other spouse. Rather, allowing every reasonable presumption in favor of the correctness of the court's action, we find that the court, in ordering the creation of two new § 529 plans, although it did not explicitly state its intention, was doing so in order to secure a potential postmajority educational support order.[22]

Although the court did not enter any postmajority educational order, it did reserve jurisdiction to enter one in the future. See General Statutes § 46b-56c (c). When a court retains jurisdiction over educational support, as the court did here, it has the discretion to issue a financial order that would secure any educational support order that might be entered in the future.[23] See *Lederle* v. *Spivey*, 113 Conn. App. 177, 194, 965 A.2d 621 (court that retained jurisdiction over educational support order did not exceed its jurisdiction by ordering maintenance of life insurance to protect minor child if either parent died prior to child completing his postsecondary education), cert. denied, 291 Conn. 916, 970 A.2d 728 (2009).

In this case, the court found that "it is more likely than not that the parents would have provided support to each of the children for higher education or private occupational school if the family were intact," and "in their proposed orders, each parent has requested that the court retain jurisdiction to enter educational support orders in the future." The court further indicated that its findings brought the issue within the ambit of § 46b-56c. Because the statutory scheme anticipates that a dissolution may occur in advance of the time postsecondary educational decisions appropriately can be made, it provides a mechanism for the court to retain jurisdiction for the purpose of ordering educational support for adult children. In its orders, the court reserved jurisdiction to enter an educational support order pursuant to § 46b-56c at an appropriate time.[24] We note, too, that the order in the court's memorandum of decision that establishes the two § 529 plans follows immediately after the order in which the court reserves jurisdiction to enter an educational support order in the future.

Our analysis is guided by this court's decision in *Sander* v. *Sander*, 96 Conn. App. 102, 899 A.2d 670 (2006). The trial court in *Sander* ordered the sale of the parties' Vermont vacation home and that $75,000 of the proceeds of the sale be held in trust for the education of the parties' daughter pursuant to § 46b-56c. Id., 113. On appeal, the plaintiff challenged the propriety of that order. Id., 115. In upholding the challenged order, this court, in *Sander*, relied on the educational support statute, § 46b-56c (h), for the expressed proposition that "an educational support order may be . . . enforced in the same manner as is provided by law for any support order." Id., 120. Thus, it is appropriate to turn to the statutes governing other support orders for the means of enforcing an educational support order. Section 46b-84 (f) concerns a parent's obligation to provide maintenance for a minor child. It provides in relevant part that "[t]he court shall make and enforce the decree for the maintenance of the child as it considers just, and may direct security to be given therefor . . . ." General Statutes § 46b-84 (f). The court in *Sander* explained that, "[as] a court may enforce these support orders by requiring that security be given, a court similarly may enforce an educational support order by requiring that security be given." *Sander* v. *Sander*, supra, 120.

"In making its [financial] orders . . . a trial court is afforded a wide latitude of discretion." *Pacchiana* v. *McAree*, 94 Conn. App. 61, 69, 891 A.2d 86, cert. denied, 278 Conn. 922, 901 A.2d 1221 (2006). The creation of a § 529 plan to fund an educational support order fits well within that latitude of discretion. In *Louney* v. *Louney*, 13 Conn. App. 270, 274–75, 535 A.2d 1318 (1988), this court upheld an order in a dissolution action

requiring that funds held in joint accounts be used for the designated purpose of the education of the parties' minor children. Here, the court similarly established § 529 plans to hold the parties' money for the express purpose of their children's postsecondary educations pursuant to § 46b-56c. We therefore conclude that the court in this case properly exercised its authority by requiring the parties to establish two § 529 plans to secure any future educational support order that may be entered for the benefit of their children.

We also do not agree with the defendant that the court entered an illegal, postmajority support order. The court did not order any further payments into the plans or that investments into the plans continue beyond the date the children turned eighteen. We do not read into the order language that which is not there and that which would contravene statutory and case law. See *Gallo* v. *Gallo*, 184 Conn. 36, 46, 440 A.2d 782 (1981) (educational fund order which contained no language continuing payments beyond age eighteen would not be read as contravening statutory and case law). Nonetheless, the court did not abuse its discretion by issuing a financial order that would secure any educational support order that might be entered in the future, at about the time the children become eighteen and are making decisions about their educational futures. As a matter of judicial economy, it would not be practical to require the parties to maintain § 529 plans for the benefit of the minor children, terminate them when the children become eighteen and reinstitute them some months later when the adult children matriculate at a postsecondary educational institution as the beneficiaries of educational support orders. See *Crews* v. *Crews*, 107 Conn. App. 279, 304, 945 A.2d 502 (2008), aff'd on other grounds, 295 Conn. 153, 989 A.2d 1060 (2010).

We also do not agree with the defendant's argument that the order is squarely in conflict with this court's decision in *Weinstein* v. *Weinstein*, 87 Conn. App. 699, 867 A.2d 111 (2005), rev'd on other grounds, 280 Conn. 764, 911 A.2d 1077 (2007). In *Weinstein*, this court found error with respect to a trial court's "decision to impute a higher level of passive income on the defendant's investments simply because another investment vehicle may have provided a higher yield." Id., 706–707. This court stated, "[r]ather, we hold that for a court to impute additional investment income capacity to a party in formulating its support orders, the court must find that the party has unreasonably depressed investment income in order to evade a support obligation or that the party's investment strategy is economically unreasonable." Id., 707. The issue in *Weinstein* concerned assessing proper passive earning capacity, and the case did not involve a claim that the court improperly ordered the defendant to make any particular investment.

The applicability of *Weinstein* to the circumstances of this case is not apparent. The basis for the court's order in the present case was not any disagreement with the manner in which the parties had chosen to invest the children's gifts—they both acknowledged that they had spent the $60,000 rather than investing it in a manner that would have directly benefitted the children, such as by placing the money in the § 529 plans already in existence. Both parties also acknowledged that they owed a debt to their children because they had spent their grandmother's gifts for expensive renovations to the Riverside house.[25] The money gifted to the children was not property acquired by either of the parties during the course of the marriage as a result of their individual efforts, and the plaintiff requested an order from the court restoring the $60,000 to the children if the Greenwich house was sold. Although § 529 plans established and funded by the parties themselves might qualify as marital property under the broad definition given to that term by our legislature in § 46b-81, in that such accounts are existing property at the time of the divorce proceedings; see *Greenan* v. *Greenan*, supra, 150 Conn. App. 311; by ordering the establishment of two new § 529 plans, the court was not distributing marital property from one spouse to the other, but securing funds for the children's future educational needs.

The court's order to establish the two § 529 plans to secure any future educational support order was eminently fair, as both parties were ordered to contribute equally to their creation after they had used the children's gift moneys to renovate a home that the children will never occupy. We conclude that the court properly exercised its authority to secure contemplated future educational support orders by requiring each party to restore one half of the children's gift money and to protect it for their future use.

III

VIOLATIONS OF PRACTICE BOOK § 25-5
AUTOMATIC ORDERS

We address the defendant's third and fourth claims jointly in this part of the opinion, as both claims pertain to alleged violations of the automatic order provisions set forth in Practice Book § 25-5 (b).[26] In the defendant's third claim, he contends that the court improperly found the defendant in contempt for one of the alleged violations of the automatic orders set forth in Practice Book § 25-5, his expenditure of $10,000 to rent a ski lodge, because there was no contempt motion pending alleging such a violation; and, in his fourth claim, the defendant contends that the court abused its discretion by finding the defendant in contempt for two violations of the automatic orders, by renting the ski lodge and by investing $39,000 in cryptocurrency, despite the fact

that both of these financial expenditures were within the "usual course of business" exception in the rule. See Practice Book § 25-5 (b) (1). For the reasons that follow, we agree with the defendant's third claim.

The following additional facts and procedural history are relevant to these claims. At trial, it was undisputed that, after the divorce action had commenced, the defendant used two new accounts to buy cryptocurrency. The defendant testified that he lost $22,000 as a result of this investment. On May 4, 2018, the plaintiff filed a motion for contempt, alleging that the defendant had wilfully violated the automatic orders by purchasing $39,004 in cryptocurrency[27] without the permission of the court or the consent of the plaintiff in writing. She further alleged that the purchase of the cryptocurrency was not a customary or ordinary investment made by either party prior to the filing of the divorce action. This pendente lite motion, like many other pendente lite motions filed in this case, was never heard,[28] but, during the dissolution trial, the plaintiff pursued it, and both parties offered evidence as to the timing, purpose and nature of this cryptocurrency purchase. During her closing argument, counsel for the plaintiff indicated that she wished to have this motion for contempt considered and granted.

The plaintiff never filed a motion for contempt that pertained to the defendant's rental of the ski lodge in September, 2018, but the plaintiff did question the defendant about his $10,000 expenditure for the lodge, which he admitted he used not only for his children, but for other family members, his girlfriend, and her children. This expenditure, made with funds from one of the defendant's checking accounts, occurred just after the parties had entered into a stipulation that the court had accepted and had made an order of the court. That stipulation provided that the defendant could use a portion of the escrowed net proceeds of his 2017 bonus to pay the mortgage on the Riverside house and the costs of the children's preschool and extended day program for 2018 and 2019. He indicated that it would not have been "customary" to discuss the rental of the ski lodge with the plaintiff prior to the expenditure. The court stated in its memorandum of decision that the plaintiff also had requested reimbursement for this expenditure as a violation of the automatic orders.

In addressing the plaintiff's two claimed violations of the automatic orders, the court held the defendant in contempt for both the ski lodge rental and the cryptocurrency purchase. After stating that there must be clear and convincing evidence of a wilful failure to comply with a clear and unequivocal order of the court in order to find a party in contempt, the court found that the automatic orders set forth in Practice Book § 25-5 are clear and unambiguous, that the evidence supported a finding that the defendant violated the auto-

matic orders in one or more instances, to wit, the crypto-currency investment of $39,000 and the rental of the ski lodge for $10,000, and that these expenditures were not in the ordinary course and were made without the written permission of the plaintiff. The court found the defendant's violation of the automatic orders to be "wilful and without good cause," found him in contempt, and ruled that it was "equitable and appropriate to make [the plaintiff] whole in some manner for said breaches." The court ordered that the net proceeds of the defendant's 2018 bonus, which was to be received at or about the time of trial, was to be divided, with 50 percent given to the defendant and 50 percent given to the plaintiff, but that a deduction of $16,000 from the defendant's 50 percent share was to be paid to the plaintiff to offset his violation of the automatic orders.

We first address the plaintiff's argument that the issue of whether the court erred in finding the defendant in contempt for the ski lodge expenditure is moot because the defendant has not challenged the other independent ground for the court's contempt ruling, i.e., his cryptocurrency investments. We disagree.

First, although precedent establishes that an appeal or claim of error can be rendered moot if the appellant neglects to challenge every independent ground on which the challenged ruling may be sustained, the defendant here has challenged both findings on which the finding of contempt was predicated. Moreover, in *Keller* v. *Keller*, 158 Conn. App. 538, 541–44, 119 A.3d 1213 (2015), appeal dismissed, 323 Conn. 398, 147 A.3d 146 (2016), this court counseled that the defendant's claim that the trial court erred in finding him in contempt would not be moot even if the defendant had not challenged both of the findings of contumacious conduct. In *Keller*, the plaintiff, in an ongoing dissolution action, appealed from a judgment holding her in contempt on two grounds. Id., 542. On appeal, the plaintiff challenged only one of the grounds for the contempt finding, and the defendant argued that the Appellate Court could not afford the plaintiff any practical relief because she had neglected to challenge the other ground. Id., 541. This court rejected the defendant's mootness argument, concluding that we make every presumption favoring our exercise of jurisdiction and ruling that the appeal was not moot because practical relief could be afforded to the plaintiff by reversing the single finding of contempt, even though there was no sanction, monetary or otherwise, imposed as a result of the contempt judgment. Id., 543–44. This court noted that, if the single finding of contempt was left undisturbed, such a finding of contumacious conduct could hurt the contemnor in the future because "a finding of contempt may well affect a later court's determination of the penalty to be imposed after a future finding of contempt." (Internal quotation marks omitted.) Id., 543.

The present case and *Keller* stand on the exact same procedural footing—in both cases, the trial court made two separate findings of contempt. Id., 543 and n.7. Even a bare finding of contempt unaccompanied by any sanction can have adverse future collateral consequences for the contemnor. Accordingly, we reject the mootness argument.

We next address the merits of the defendant's claim that the court erred in finding him in contempt for violating the automatic orders by renting the ski lodge because there was no motion for contempt pending on that issue. Although we agree with the defendant that the court improperly held him in contempt with respect to the seasonal ski lodge rental because there was no motion for contempt pending on that issue, we conclude, nevertheless, that the court properly determined that the rental was not in the usual course of business and that, therefore, it had the authority to fashion a remedial order to offset the defendant's violation of the automatic orders by leasing the ski lodge, despite the improper contempt finding.

"Contempts of court may . . . be classified as either direct or indirect, the test being whether the contempt is offered within or outside the presence of the court." *Brody* v. *Brody*, 315 Conn. 300, 317, 105 A.3d 887 (2015). This is a case of civil contempt. A refusal to comply with an automatic order in Practice Book § 25-5 is an indirect contempt of court because it occurs outside the presence of the trial court. In determining whether a contempt of court is civil or criminal, we look to the nature of the relief ordered. "A contempt fine is civil if it either coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 489, 499, 970 A.2d 570 (2009).

There are constitutional safeguards that must be satisfied in indirect contempt cases. "It is a fundamental premise of due process that a court cannot adjudicate a matter until the persons directly concerned have been notified of its pendency and have been given a reasonable opportunity to be heard in sufficient time to prepare their positions on the issues involved." (Internal quotation marks omitted.) *Leftridge* v. *Wiggins*, 136 Conn. App. 238, 244, 44 A.3d 217 (2012). It is axiomatic that due process of law requires that one charged with contempt of court be advised of the charges against him, i.e., that he is notified that he is being accused of being in contempt of court, is given a reasonable opportunity to defend the contempt charge by way of defense or explanation, be represented by counsel and be given a chance to testify and to call witnesses in his behalf. It is not disputed that the plaintiff failed to file a written motion with the court seeking to have the

defendant found in contempt for violation of the automatic orders due to his rental of the ski lodge. Practice Book § 25-23 incorporates Practice Book § 11-1, which requires motions to be in writing, and Practice Book § 25-27 specifies what specifically should be alleged in a motion for contempt. "The purpose of requiring written motions is not only the orderly administration of justice . . . but the fundamental requirement of due process of law." (Citation omitted.) *Connolly* v. *Connolly*, 191 Conn. 468, 475, 464 A.2d 837 (1983). Accordingly, as there was no notice to the defendant that he was facing a finding of contempt with respect to the ski lodge rental, the court erred when it held the defendant in contempt for spending $10,000 on the rental of the ski lodge after the automatic orders went in effect.

Our consideration of the validity of the court's finding that the ski lodge expenditure violated the automatic orders, however, does not end here. In *O'Brien* v. *O'Brien*, supra, 326 Conn. 81, our Supreme Court held that, even in the absence of a contempt finding, a trial court has the authority to compensate a spouse for losses caused by a violation of the automatic orders by adjusting the distribution of marital assets in the injured spouse's favor. Id., 96; see also *Clement* v. *Clement*, 34 Conn. App. 641, 647, 643 A.2d 874 (1994) ("[i]n a contempt proceeding, *even in the absence of a finding of contempt*, a trial court has broad discretion to make whole a party who has suffered as a result of another party's failure to comply with the court order" (emphasis added; internal quotation marks omitted)). Thus, if the lease of the ski lodge was a violation of a court order, the court was free to craft a remedial order. In the present case, the court's order that the defendant reimburse the plaintiff for one half of the $10,000 cost of the ski lodge rent was remedial in nature.[29]

Next, we address the defendant's challenge to the court's finding of contempt based on his investment in cryptocurrency and the consequential sanction of reimbursement, and the court's remedial order regarding the rental of the ski lodge, on the basis of both being violations of the automatic orders. As to both the expenditure for the rental of the ski lodge and the investment in cryptocurrency, the defendant argues that they both met the exception in Practice Book § 25-5 for the transfer or disposal of marital property "in the usual course of business." We are not persuaded.

Whether a particular transaction has been conducted in the usual course of business presents a question of fact, to be determined by looking to the circumstances of each case. See *Quasius* v. *Quasius*, 87 Conn. App. 206, 208, 866 A.2d 606 (reviewing trial court's finding concerning usual course of business exception for abuse of discretion because trial court is "in the best position to assess all of the circumstances surrounding a dissolution action" (internal quotation marks omit-

ted)), cert. denied, 274 Conn. 901, 876 A.2d 12 (2005). "Whether a transaction is conducted in the usual course of business does not turn solely on the type of asset or transaction but on whether the transaction at issue was '*a continuation of prior activities*' carried out by the parties before the dissolution action was commenced." (Emphasis in original.) *O'Brien* v. *O'Brien*, supra, 326 Conn. 115.

In *O'Brien*, our Supreme Court addressed the plaintiff's claim that his stock and option transactions did not violate the automatic orders established under Practice Book § 25-5 because they fell within the exception for transactions made "in the usual course of business." Id., 112. The court began by adopting an expansive definition of business: "We do not suggest . . . that the usual course of business exception is reserved only for transactions made in connection with a party's business or profession; rather, because the automatic orders are intended to maintain the status quo between the parties, the exception would appear to extend to personal transactions, but only if any such transactions are conducted in the normal course of the parties' ordinary activities, such that both parties would fully expect the transactions to be undertaken without prior permission or approval." Id., 115 n.12. Thus, personal transactions, such as the rental of the ski lodge and the cryptocurrency investment in the present case, will meet the exception only if they previously were conducted in the normal course of the parties' ordinary activities, such that both parties would fully expect the activity to be undertaken without the actor obtaining prior consent. See id.

We conclude that the court did not abuse its discretion in finding that the exception did not apply in the present case to the rental of the ski lodge or the investment in cryptocurrency. The defendant admitted that he did not request permission from the plaintiff before he purchased the cryptocurrency, that he purchased it for the first time between November, 2017 and January, 2018, and that he did not have accounts to purchase the cryptocurrency prior to the commencement of the dissolution action. During closing argument, the court alerted the defendant to the *O'Brien* case, likened the defendant's conduct to that of the husband in *O'Brien*, and then asked counsel who should bear the burden for the cryptocurrency loss. In response, the defendant's counsel admitted, "[l]isten, he's got some exposure in that regard . . . in terms of offset and loss."

Similarly, in September, 2018, while the divorce action was pending, the defendant withdrew $10,000 from a checking account for the ski house rental without the plaintiff's permission. He claims that this was in the usual course of business because the parties, during the course of their marriage, took vacations with the children. There is a distinction, however, between

a vacation rental that one or both of the parties customarily had agreed to undertake while the marriage was still intact, and an unprecedented rental of a ski lodge that the defendant used on weekends with not only the parties' minor children, but with friends, his girlfriend, and his girlfriend's children. While they were still living together, the parties had never rented a ski lodge. The defendant admitted that he did not discuss the rental of the ski lodge with the plaintiff in September, 2018. He indicated that he took weekend ski trips with the children, but never went skiing with the plaintiff without the children because she does not ski. There is no evidence that a seasonal rental of a ski lodge, with or without the plaintiff, was customary during the marriage. Accordingly, the court was justified in concluding that this expenditure also was not in the usual course of business.

In light of the foregoing, we conclude that the court properly found the defendant in contempt for the cryptocurrency investment as a violation of the automatic orders and for concluding, despite its improper finding of contempt, that the defendant further violated those orders by virtue of his having rented the ski lodge. It was not an abuse of discretion for the court to order the defendant to reimburse the plaintiff for one half of the $10,000 cost for rental of the ski lodge as a remedial order and for one half of the $22,000 loss that he incurred as a result of the cryptocurrency investment as a sanction for his contempt of court.

IV

FAILURE TO ATTRIBUTE AN EARNING CAPACITY
TO THE PLAINTIFF

The defendant's next claim is that the court abused its discretion by failing to attribute an earning capacity to the plaintiff in determining alimony and child support. The defendant argues that, under the circumstances of the present case, the court should have based its financial orders on the plaintiff's earning capacity, rather than on her actual earned income. Moreover, the defendant argues that, in light of the evidence of the plaintiff's prior earnings, her age, and her qualifications, the court improperly awarded child support and alimony based on a finding of no actual net income. We disagree.

The court determined that the basic child support obligation and alimony orders "must be based upon the net income of the parties." It then found that the plaintiff's net income was $0 per week and relied on that finding in crafting its financial orders. The defendant argues that the court erred in not attributing an earning capacity to the plaintiff based on her earnings earlier in the marriage, which, over a two year period in 2010 and 2011, had been in the range of $45,000 to $65,000.

"An appellate court will not disturb a trial court's

orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . It is within the province of the trial court to find facts and draw proper inferences from the evidence presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . [T]o conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.§ (Citations omitted; internal quotation marks omitted.) *Tracey* v. *Tracey*, 97 Conn. App. 122, 124–25, 902 A.2d 729 (2006).

First, we address the argument that the court's analysis was flawed as a matter of law because the court relied on the plaintiff's actual earnings, rather than on her earning capacity. "[O]ur case law is clear that a party's earning capacity is the amount that he or she realistically can be expected to earn. . . . It is not the amount the party previously has earned or currently may be earning." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Steller* v. *Steller*, 181 Conn. App. 581, 592, 187 A.3d 1184 (2018). "In marital dissolution proceedings, *under appropriate circumstances*, the trial court *may* base financial awards on the earning capacity rather than the actual earned income of the parties . . . when . . . there is specific evidence of the [party's] previous earnings. . . . It is particularly appropriate to base a financial award on earning capacity where there is evidence that the [party] has voluntarily quit or avoided obtaining employment in [the party's] field." (Emphasis in original; internal quotation marks omitted.) *Brown* v. *Brown*, 148 Conn. App. 13, 21–22, 84 A.3d 905, cert. denied, 311 Conn. 933, 88 A.3d 549 (2014). "Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." (Internal quotation marks omitted.) *Elia* v. *Elia*, 99 Conn. App. 829, 833, 916 A.2d 845 (2007).

The defendant claims that the court should have attributed an earning capacity to the plaintiff of between $65,000 and $85,000, based on her testimony as to what she had earned in 2012, the last time she was employed. The court found that the plaintiff considered herself a

full-time homemaker although, while at home, she once had performed a part-time bookkeeping project for a friend, earning approximately $4000 to $5000, and had overseen the renovations to the Riverside house. Some acquaintances also had paid her to take photographs as photography was a hobby of hers. The most she had been paid for her photographs was $495 in one year. The court further found that the plaintiff had not worked full-time since 2012, which coincided with the birth of the parties' first child. The plaintiff testified that she and the defendant planned that she would stay home and care for the children as it did not make economic sense for her to incur child care expenses that would be necessary as a result of her employment. She testified that if she were to work, the quality of her children's lives would suffer, as they had suffered while she was busy with the renovations of the Riverside house. She also testified that she had no family living in the United States to assist her with the two children.

During closing arguments, the court expressed its appreciation for the hard work required of both working mothers and homemakers. The court entered parenting orders that established the plaintiff's home as the primary residence of the children.

With respect to the plaintiff's health, the court found that she has vision problems and a serious hearing deficit. The plaintiff testified that the hearing impairment substantially worsen in the last five years and that she cannot hear "half of what's going on." She indicated she has 65 percent hearing loss in her right ear and that she planned to have surgery, which might not fully restore her hearing to 100 percent. The two minor children at the time of the dissolution were still preschool age and, with the exception of the photography projects and the bookkeeping project, the plaintiff was unemployed, while the defendant's annual gross income was in excess of $900,000.

Acknowledging the importance of a mother's role, the court reasonably could have determined that the plaintiff's desire to stay home and to raise her children for the foreseeable future was not an act of indolent work avoidance. There was evidence that the parties had decided that after their first child was born the plaintiff would no longer work, the birth of their second child occurred soon after the birth of their first child, their children were very young in age, the plaintiff had a hearing disability, and, with the defendant's approval, the plaintiff had been primarily a full-time homemaker for five years prior to the filing of the dissolution action because her working did not make economic sense given transportation, day care and other expenses. In light of these undisputed circumstances, the court reasonably could have determined that the plaintiff did not voluntarily quit or avoid employment in her field. Thus, the court's determination to base its awards of

child support and alimony on the plaintiff's actual income at the time of the dissolution, which it found to be zero, was not contrary to law.[30]

We further observe that, in considering all relevant statutory criteria, no single criterion is preferred over others, and the trial court, in entering its financial orders, has broad discretion in varying the weight placed on each criterion under the circumstances of each case. See *Jungnelius* v. *Jungnelius*, 133 Conn. App. 250, 262, 35 A.3d 359 (2012). The court expressly stated that it had considered all of the relevant statutes before rendering its judgment. It awarded the plaintiff time limited alimony, taking into consideration the factors set forth in General Statutes § 46b-82, including the age, education, earnings and work experience of the wife, as well as her current primary parenting responsibilities, and found that, in light of the facts and circumstances of the case, a time limited award of alimony, which will end in 2029, before either child attains the age of majority, was appropriate. Thus, the court impliedly found that the plaintiff would have the capacity in the future to earn a salary sufficient to support herself. The court reasonably could have concluded that the plaintiff's childcare responsibilities and health concerns would not permit an immediate, cost beneficial return to the workforce but that, eventually, there would need to be a gradual return to gainful employment on the plaintiff's part. The court also determined that the amount of alimony awarded to the plaintiff would be nonmodifiable by the defendant if the sole basis for the modification were to be the annual gross earnings of the plaintiff of $35,000 or less, which is one way to encourage a nonworking spouse to eventually return to the workforce.

To the extent that the defendant, apart from arguing that the court improperly relied on the plaintiff's actual net income, incorrectly found that her actual net income was $0 at the time of the dissolution, we readily conclude that this finding was consistent with the evidence, including the plaintiff's financial affidavit dated November 16, 2018, on which the court expressly relied. Accordingly, the court's finding in this regard was not clearly erroneous.

V

AWARDS OF ATTORNEY'S FEES TO THE PLAINTIFF

The defendant's final claim is that, in violation of the directive of § 46b-62 (a)[31] and relevant decisional law, the court erred in awarding the plaintiff attorney's fees for representation during the marital dissolution proceedings, postjudgment matters and this appeal. We are not persuaded.

Before we consider the orders at issue in this claim—one related to attorney's fees incurred during the dissolution proceedings and one related to attorney's fees

incurred during postjudgment matters and in connection with the present appeal—we set forth the relevant legal principles. In dissolution and other family court proceedings, pursuant to § 46b-62 (a), the court may order either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the equitable criteria set forth in § 46b-82, the alimony statute. That statute provides that the court may consider "the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81" for the assignment of property. General Statutes § 46b-82. Section 46b-62 (a) applies to postdissolution proceedings because the jurisdiction of the court to enforce or to modify its decree is a continuing one and the court has the power, whether inherent or statutory, to make allowance for fees. See *Krasnow* v. *Krasnow*, 140 Conn. 254, 262, 99 A.2d 104 (1953). "Whether to allow counsel fees, [under § 46b-62 (a)], and if so in what amount, calls for the exercise of judicial discretion. . . . An abuse of discretion in granting counsel fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." (Citation omitted; internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 386, 999 A.2d 721 (2010); see also *Pena* v. *Gladstone*, 168 Conn. App. 175, 186, 146 A.3d 51 (2016).

A trial court is not limited to awarding fees for proceedings at the trial level. Connecticut courts have permitted postjudgment awards of attorney's fees to defend an appeal. See *Friedlander* v. *Friedlander*, 191 Conn. 81, 87–88, 463 A.2d 587 (1983) (affirming award of attorney's fees to defend appeal); see also *Olson* v. *Mohammadu*, 169 Conn. App. 243, 264 n.11, 149 A.3d 198, cert. denied, 324 Conn. 903, 151 A.3d 1289 (2016).

A

We first consider the validity of the order issued by the court, the Honorable *Michael E. Shay*, judge trial referee, at the time he rendered the judgment of dissolution, awarding attorney's fees of $40,000 to the plaintiff.[32] On December 10, 2018, the plaintiff filed a motion for counsel fees pendente lite and an affidavit of attorney's fees was filed by the plaintiff's counsel, Attorney Catherine P. Whelan, on December 21, 2018. The plaintiff sought $70,132.34 in fees that had accrued as of December 20, 2018.[33] In its memorandum of decision, the court indicated that it had reviewed Attorney Whelan's affidavit and found the attorney's fees incurred by the plaintiff to be fair and reasonable under all of the circumstances. It further indicated that "to require the [plaintiff], who [had] a minimal earning capacity and

the [primary] responsibility for the two minor children, to pay [all of] these fees from her portion of the marital assets awarded to her by virtue of [the court's decision] would undermine the purposes of the same; and that it would be fair and equitable for the defendant to pay a portion of [the plaintiff's fees]." The court ordered the defendant to pay Attorney Whelan the sum of $40,000 as a portion of the legal fees and the costs of suit incurred by the plaintiff in connection with this case, and the plaintiff was ordered responsible for any balance due thereafter. The court ruled that the defendant shall be responsible for any fees and costs incurred by him.

The defendant claims that the plaintiff received ample liquid funds from the trial court's judgment with which to pay the attorney's fees awarded to her and that the court, in awarding her these fees, unreasonably concluded that it would undermine the financial package awarded to her at the time of the dissolution if the plaintiff had to pay her own fees. He also asserts that the plaintiff was awarded substantial alimony and child support as well as a higher percentage of the parties' assets. The plaintiff contends that the trial court properly exercised its discretion in awarding her attorney's fees and reasonably concluded that not doing so would have undermined her other financial awards.

Although the basic focus of § 46b-62 (a) is compensatory and supports an award only if the prospective recipient of a fee award lacks ample liquid assets to cover the cost of his or her own legal expenses, our Supreme Court, in *Eslami* v. *Eslami*, 218 Conn. 801, 820, 591 A.2d 411 (1991), held that in addition to the situation in which one party does not have ample liquid assets to pay attorney's fees, a court also may award fees even if the movant has ample liquid assets when the failure to award them will undermine the court's other financial orders. Judge Shay expressly relied on the latter justification in awarding the plaintiff attorney's fees. See, e.g., *Maguire* v. *Maguire*, 222 Conn. 32, 44, 608 A.2d 79 (1992). He made no finding as to whether or not the plaintiff had ample liquid assets, nor was he required to do so. Our Supreme Court has recognized that "[t]he availability of sufficient cash to pay one's attorney's fees is not an absolute litmus test. . . . [A] trial court's discretion should be guided so that its decision regarding attorney's fees does not undermine its purpose in making any other financial award." (Internal quotation marks omitted.) *Hornung* v. *Hornung*, 323 Conn. 144, 170, 146 A.3d 912 (2016). An award of counsel fees to a spouse who had sufficient liquid assets may be justified if the failure to do so would substantially undermine the other financial awards. See *Eslami* v. *Eslami*, supra, 820.

On her financial affidavit filed at the time of the dissolution, the plaintiff claimed no weekly net income,

a total of $957,500 in assets, $9183.68 in weekly expenses and $232,300 in liabilities. The defendant's financial affidavit reflected a net weekly income from his base salary of $4462. Also in evidence was a paystub reflecting his 2017 bonus income with deductions. His claimed weekly expenses were $13,313, his assets were $1,523,242, and his liabilities were $262,852, including an unspecified amount owed for his own attorney's fees.

The court ordered the parties to split equally their bank accounts, including the previously escrowed sum from what was left of the defendant's 2017 bonus, $63,000, and to split equally the net proceeds from the defendant's 2018 bonus, which the defendant testified would be $550,000 gross. Additionally, the plaintiff received $16,000 on account of the defendant's violation of the automatic orders, the Greenwich condominium with $150,000 in equity, one half of the net proceeds after the sale of the Riverside house, listed for sale at the time of dissolution at $2.45 million with $1.03 million in equity and one half of the net proceeds after the sale of the Brooklyn co-op, with equity of approximately $190,000. The plaintiff also was awarded the properties in Azerbaijan—an apartment and an apple orchard, valued at approximately $50,000—which were both being used by her mother. The plaintiff was additionally awarded a $483,910 share of the parties' retirement assets. The defendant was awarded $303,839 as his share of the retirement assets.

What the defendant fails to acknowledge is the obvious fact that, for the foreseeable future, the plaintiff will be in a far less favorable position than he is to earn a significant salary and, thus, to be able to further enhance the marital assets that she has acquired as the result of the dissolution or to acquire additional assets.

In addition to Judge Shay's indication that not awarding the plaintiff $40,000 in attorney's fees would undermine the other financial orders pursuant to *Maguire* v. *Maguire*, supra, 222 Conn. 44, Judge Shay's decision expressly stated that he considered the statutory criteria set forth in § 46b-82, as required by § 46b-62. That general reference by the court to those criteria is all that is required. See *Jewett* v. *Jewett*, 265 Conn. 669, 693, 830 A.2d 193 (2003) (court is not obligated to make express findings on each of statutory criteria in making award of attorney's fees under § 46b-62). The court is "free to weigh the relevant statutory criteria without having to detail what importance it has assigned to the various statutory factors." (Internal quotation marks omitted.) *Greco* v. *Greco*, 70 Conn. App. 735, 740, 799 A.2d 331 (2002).

There was evidence reflective of these criteria that the court might reasonably have considered when it determined to award the plaintiff a portion of her attorney's fees. She had no income while the defendant's

income is in the high six figures. At the time of the dissolution, she had significant debt to pay—almost $200,000—a good portion of which had developed because she borrowed money to renovate the Riverside house. She further testified that due to the defendant's failure to voluntarily provide her and the children with support throughout 2018, she had to borrow money from friends and her mother, and could only meet even basic expenses for her and the children by maxing out her credit cards.[34]

Once the defendant quitclaims the Greenwich condominium to the plaintiff, she will be responsible for the mortgage, taxes, insurance, condominium fees and all other carrying expenses. The mortgage payment alone is $2700 per month. She will be responsible for maintaining the lease on her vehicle. She received no health insurance benefits as part of the dissolution orders, and will have to incur expenses to purchase them. Should she attempt to return to work on a full-time or part-time basis, there is no clear provision in the divorce decree for any reimbursement by the defendant to her for day care costs.[35] She also may continue to incur costs for herself and the children to visit her mother and other relatives in Azerbaijan once a year, as she had during the marriage. The court also still held her responsible for nearly one half of her attorney's fees.

Pursuant to the § 46b-82 criteria, in awarding counsel fees, the court also may consider the causes for the dissolution and, in this case, the court had concluded that the defendant was primarily at fault, finding that the evidence supported a finding that "for years he has been carrying on a long time extramarital affair with a person he met on a ski trip." It also may consider the plaintiff's earning capacity, which it determined was minimal, the great disparity between the parties' earning capacities; see *Emanuelson* v. *Emanuelson*, 26 Conn. App. 527, 533–34, 602 A.2d 609 (1992) (attorney's fees award amounting to approximately 3 percent of wife's liquid assets was not abuse of discretion in light of, inter alia, fact that husband caused breakdown of marriage and great disparity between parties' earning capacities); the amount of her income, which it found to be zero, her employability, and in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent securing employment.

Moreover, several of the assets awarded to the plaintiff also were not necessarily easily or quickly liquidated. It was not clear when either of the two properties ordered sold would actually be sold. The Brooklyn co-op sales contract had a mortgage contingency clause, and the Riverside house had been on the market for more than one year.[36] Given the amount of her credit card debt, it might not be easy for the plaintiff to sell the Greenwich condominium and buy something less

expensive to maintain, and she and the children need a place in which to live. The court reasonably could have determined that it did not want the plaintiff to have to reach into her awarded retirement funds and incur possible tax penalties. The division of the defendant's Fidelity IRA was going to require the drafting of a QDRO. The only assets she was awarded that were capable of being immediately liquidated were her share of the bank accounts and the equal division of the defendant's 2018 bonus. The plaintiff owed a total of $70,132.34 in attorney's fees, which, contrary to the defendant's contention, does not represent a small fraction of the liquid assets awarded to her. See *Misthopoulos* v. *Misthopoulos*, supra, 297 Conn. 383–87 ($64,000 attorney's fees award was proper when "the overwhelming majority of the assets awarded to the [wife] were not liquid assets," given that "$2.6 million of the approximately $3.2 million in assets awarded to the [wife] consisted of the family home in which the [wife] and the parties' three minor children resided" and "also included her interest in a trust . . . certain retirement accounts, vested stock and vested stock options").

The court reasonably could have concluded that, in spite of its generous child support and alimony awards, there was a need to protect the financial package it had established for the plaintiff to allow her, prior to her alimony being terminated in ten years or earlier, to achieve a more financially stable, less dependent position in her life, which it acknowledged would be complicated by the raising of two children and her hearing deficit. Having rejected the plaintiff's request for lifetime alimony, the court reasonably could have endeavored to assure that the plaintiff had a strong financial base on which to build before the expiration of the alimony and child support orders, which was not going to occur that far into the future. This is illustrated by the fact that the court also allowed the plaintiff to earn $35,000 before the defendant could use any potential earnings on her part as a basis for a modification. See *Weiman* v. *Weiman*, 188 Conn. 232, 235, 237, 449 A.2d 151 (1982) ($10,000 attorney's fees award to wife was proper when trial court "could reasonably have concluded that [her] financial resources . . . were necessary to meet her future needs" and alimony awarded to her "was not substantial in amount nor was it for a long period of time"). In this case, the plaintiff would receive a monthly alimony award of only $6200 and would not receive her 50 percent share of the defendant's gross bonus income until the end of 2019.

Affording the court every reasonable presumption in favor of the correctness of its decision, we assume that Judge Shay, in determining his award of pendente lite attorney's fees to the plaintiff, relied on evidence relevant to each statutory criterion as it applied to both parties. We therefore conclude that Judge Shay properly

exercised his discretion in granting the plaintiff's motion for attorney's fees.

B

We next address the claim raised in the defendant's amended appeal, which is that the court, *Hartley Moore, J.*, abused its discretion in awarding the plaintiff postjudgment counsel fees—$10,000 for postjudgment litigation and $20,000 to defend this appeal.

On February 1, 2019, the plaintiff filed two motions for counsel fees to cover postjudgment fees incurred as a result of postjudgment litigation that she alleged had become necessary to protect her interests and assets at the trial level, and one motion seeking fees to defend this appeal. The first motion sought attorney's fees that were necessary to prosecute and defend a number of postdissolution motions filed by both parties between January 4 and April 1, 2019.

An evidentiary hearing was held before the court, *Hartley Moore, J.*, on April 1, 2019. Judge Hartley Moore heard testimony from both parties. The defendant testified that he had moved to an apartment in Greenwich with his girlfriend and was not only paying partial rent for his former apartment in White Plains, New York, but also paying a higher rent, $4800, in Greenwich, with assistance from his girlfriend. During his testimony, he admitted that, on March 12, 2019, he had e-mailed the plaintiff and demanded that she pay one half of the $22,922 that he had paid for the children to be able to ski that winter, which included the cost of renting the ski lodge, as her 50 percent share of an extracurricular activity pursuant to the dissolution orders. He further testified that he had paid a new law firm, Pullman & Comley, LLC, a $50,000 retainer—$15,000 for postjudgment litigation and $35,000 to represent him in this appeal. He also indicated that he had paid most of the fees owed to the attorneys that represented him during his divorce and that he owed only $37,000 out of a total of more than $220,000.

The plaintiff indicated that she was now paying the mortgages for the Greenwich condominium and the Brooklyn co-op, even though the latter was ordered to be paid by the defendant until it sold, and that she had started working part-time. She could not afford health insurance for herself. She still owed more than $90,000 in credit card debt, and was behind on her car payments. She no longer had the ability to borrow from her mother after borrowing another $10,000 in February, 2019, to partially pay her legal fees.

Judge Hartley Moore, in issuing her orders, indicated that she had considered the parties' respective financial abilities and the criteria set forth in §§ 46b-62 and 46b-82, which, as noted previously, was all that she needed to do. She did not need to mention each and every criterion specifically. See *Greco* v. *Greco*, supra, 70

Conn. App. 730–40. She then granted both motions after finding that the defendant "was able to obtain significant funds for a retainer for new counsel to represent him postjudgment," and that he had "rented an expensive ski house for the season and [had] started paying the alimony and child support order in February, 2019. The plaintiff has nominal income from part-time employment and has the primary responsibility of caring for two very young children. Moreover, the plaintiff was awarded counsel fees in the underlying dissolution of marriage action.

The defendant claims that, because Judge Hartley Moore mentioned his seasonal rental of the ski lodge and his lack of any child support or alimony payments to the plaintiff until February, 2019, her orders were therefore punitive, intended to punish him for his pendente lite failings. The defendant further claims that the court improperly considered the retainer that he had paid to his appellate attorney, the ski lodge rental, and the plaintiff's primary responsibility for the care of the children as consideration for awarding fees because the plaintiff already was adequately compensated for childcare with her child support award and for the ski lodge rental, which had been determined to be a violation of the automatic orders, by Judge Shay's $16,000 remedial order. Finally, he claims that the defendant's ability to pay a retainer to his own attorney should have had no bearing on Judge Hartley Moore's decision. We disagree.

Granting Judge Hartley Moore every reasonable presumption in favor of the correctness of her decision, we believe her commenting on the expensive ski lodge rental was because it became an issue during the April 1 hearing as the result of the defendant's demand of the plaintiff in an e-mail that she reimburse him for 50 percent of the cost of extracurricular skiing expenses for the children, including the cost for renting the ski lodge. Judge Hartley Moore may have referenced the ski lodge rental in order to find that the plaintiff did not owe the defendant any compensation for that rental based on Judge Shay's decision. Obviously, any money the defendant claimed the plaintiff was not paying him pursuant to the orders of the court might have had an effect on her request for counsel fees.

Judge Hartley Moore's mention of the fees the defendant paid to his appellate attorney, the fact that the defendant did not begin to pay alimony and child support until after the divorce and the plaintiff's primary childcare responsibilities were fair and legitimate comment on certain of the criteria she is permitted to consider under §§ 46b-62 (a) and 46b-82 when determining whether attorney's fees should be awarded. She was allowed to consider the parties' financial abilities, noting the plaintiff's nominal earnings, the needs of the parties, their station, and in the case of a parent to

whom custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment. See General Statutes § 46b-82.

In addition, the court appropriately referred to the judgment of dissolution wherein, only a few months earlier, Judge Shay had awarded the plaintiff attorney's fees incurred by her in connection with the underlying dissolution action, and stated that the intent of his award was to preserve for the plaintiff the financial benefits the dissolution court had created for her with its financial orders. See *Maguire* v. *Maguire*, supra, 222 Conn. 43–44. Given the few months in time that had elapsed since the judgment of dissolution had been rendered, Judge Hartley Moore was entitled to take Judge Shay's recent decision into account, especially because the plaintiff had yet to receive the full benefit of the property distribution awards. Judge Hartley Moore was not required to "make an express finding with respect to whether the fee award is necessary to avoid undermining the other financial orders, so long as the record supports that conclusion." *Grimm* v. *Grimm*, 276 Conn. 377, 397, 886 A.2d 391 (2005), cert. denied, 547 U.S. 448, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). By stating that she had considered Judge Shay's finding in awarding attorney's fees, we can reasonably infer that Judge Hartley Moore agreed with his finding.

Affording the court every reasonable presumption in favor of the correctness of its decision, we conclude that Judge Hartley Moore reasonably could have relied on evidence relevant to each statutory criterion as it applied to both parties, and conclude that she properly exercised her broad discretion in granting the plaintiff's motions for attorney's fees.

The judgment is reversed only with respect to the finding of contempt against the defendant for the violation of the Practice Book § 25-5 automatic orders related to the rental of the ski lodge and the case is remanded with direction to vacate that finding; the judgment and the postjudgment orders awarding attorney's fees are affirmed in all other respects.

In this opinion the other judges concurred.

[1] As will be discussed in greater detail later in this opinion, the attorney's fees awarded for representation during the dissolution were ordered by the Honorable Michael E. Shay, judge trial referee. The fees awarded for representation during postjudgment proceedings and to defend this appeal were ordered by Judge Margarita Hartley Moore.

[2] Prior to the dissolution, pursuant to a pendente lite order based on a stipulation of the parties dated August 7, 2018, the defendant had access to the children every Wednesday night and every other weekend. The court annexed to its decision a "Regular Parenting Plan" or "Schedule A," to which the parties never agreed, and made this Schedule A part of its parenting orders. The court granted the defendant access to the children on alternating weekends and Wednesday nights from 6 p.m. to Thursday morning, as well as additional access on designated holidays, birthdays, school breaks and two nonconsecutive weeks during the summer. The orders pertaining to the parties' joint legal custody, parental access and other parenting responsibilities are not challenged on appeal.

[3] During a hearing on the plaintiff's postjudgment motions for attorney's

fees on April 1, 2019, the defendant testified that he recently had received his 2018 bonus of $550,000.

[4] The plaintiff testified that the parties paid $2.5 million for the Riverside house and spent $500,000 on the renovations. At the time of the dissolution, it had been listed at $2,495,000 after being on the market for more than a year. On March 1, 2019, the defendant filed a motion to terminate the appellate stay regarding the orders for the sale of the Riverside house. In his motion, he alleged that the plaintiff was refusing to consider offers of purchase and that the mortgage on the property, which he was obligated to pay, was $24,000 in arrears. After a hearing, the court granted the motion to allow for the listing and sale of the property with the net proceeds of any sale to be held in escrow pending the outcome of this appeal.

[5] Both parties testified that the plaintiff supervised the renovation project as if she were the general contractor.

[6] On December 12, 2017, the plaintiff filed a motion to enjoin, pendente lite, seeking to prevent the defendant from reducing in "any way, shape or form" the net bonus he had received from his employer for the calendar year 2017.

In an oral decision, the court, *Colin, J.*, granted the motion after making the following finding: "The evidence showed that the defendant received a substantial bonus. He unilaterally decided to pay off a substantial amount of debt notwithstanding any difficulties that may exist in communication between the parties.

"The common sense, right thing to do would have been to discuss with [the plaintiff] how you were going to spend $145,000 approximately before you did it. . . . The moving party has established enough probable cause that without some further relief there's some risk that the remaining portion of the bonus will be spent without the moving party having any input or say into it."

[7] The court cited to nine separate sections of the General Statutes, specifically General Statutes §§ 46b-56, 46b-56a, 46b-56c, 46b-62, 46b-81, 46b-82, 46b-84, 46b-87 and 46b-215a. It also stated that it had considered the Child Support and Arrearage Guidelines Regulations, effective July 1, 2015.

[8] This type of alimony order in family cases is often referred to as an income "safe harbor" provision. See, e.g., *Hornung* v. *Hornung*, 323 Conn. 144, 186, 146 A.3d 912 (2016) (*Zarella, J.*, dissenting).

[9] The amount in the HSBC checking account is not ascertainable from the record.

[10] On her financial affidavit, the plaintiff claimed $232,300 in liabilities. The defendant claimed $262,852. These amounts included significant balances on a number of credit cards held by each of them and loans from friends and family members. The defendant also was in arrears on the mortgage payments for all three properties owned by the parties.

[11] The plaintiff claimed that her E-Trade account was worth $1300 and the defendant claimed that his E-Trade account was worth $1033.

[12] On June 25, 2019, the defendant filed motions for articulation of the court's January 10, 2019 and April 8, 2019 orders. Both motions were denied, and the defendant moved this court for review on July 15, 2019. On September 19, 2019, this court granted the defendant's motions for review but denied the relief requested.

[13] In contrast, after ordering the defendant to pay to the plaintiff $3400 per month for child support, the presumptive maximum amount under the child support guidelines, the court ordered supplemental child support to be paid from the defendant's bonus in a sum "equal to 10 percent of the husband's net bonus after taking into account the normal 'allowable deductions' for the first $250,000 and 5 percent of the excess thereof, up to and including a ceiling of $750,000." The court indicated that a supplemental award of child support based on the defendant's bonus income should be expressed as a percentage not to exceed 17.71 percent. See Regs., Conn. State Agencies § 46b-215a-2c (e); see also *Maturo* v. *Maturo*, 296 Conn. 80, 96, 995 A.2d 1 (2010).

[14] See *Maturo* v. *Maturo*, 296 Conn. 80, 120, 995 A.2d 1 (2010) (court may fashion financial order by utilizing capped percentage of gross bonus as supplemental alimony, eliminating practical difficulties inherent in order).

[15] For the first time on appeal, the defendant also raises a claim in his principal and reply briefs that the 2017 passage of the Tax Cuts and Jobs Act (TCJA), Pub. L. No. 115-97, 131 Stat. 2054 (2017), and its changes to the tax treatment for alimony payments by a spouse in the Internal Revenue Code, 26 U.S.C. § 71, made it "impossible" for the court to determine what the defendant's net bonus income would be when he begins paying alimony.

The TCJA changed the law to eliminate the deduction for alimony, effective January 1, 2019. This is an issue the defendant did not distinctly raise in the trial court and we decline to review it as it is unpreserved. The defendant at trial presented no argument to the court on this purported impossibility with respect to his particular financial situation. In fact, in his proposed orders to the court, the defendant proposed an order of "additional alimony" equal to "20 percent of the *gross* amount of any bonus(es) up to $500,000, which [the defendant] may receive from his employment if the case proceeds to judgment before January 1, 2019, or 15 percent of the net amount of any bonus(es) up to $500,000 if the case goes to judgment thereafter." (Emphasis added.) This proposal certainly does not suggest to the court that an order calculated after January 1, 2019, had been rendered impossible by the TCJA.

Although the defendant filed a motion for articulation, he did not seek further articulation from the court regarding its rationale for the supplemental alimony order and whether it took into account the changes in the tax code ending deductions for alimony payments. Counsel for the defendant acknowledged in his closing argument that an alimony award might not be tax deductible to the defendant and that such an award should be reduced if it was no longer going to be deductible. As we presume the court knows the law, and allow every reasonable presumption in favor of the correctness of its action, even if we were to review this claim, we would have no basis to conclude that the court, in ordering the payable percentages from the defendant's gross annual bonus as supplemental alimony after January 1, 2019, failed to consider the impact of the change in the tax code.

[16] Title 26 of the United States Code, § 529, provides for the creation of an account specifically designed for higher education related qualified expenses. Earnings on contributions invested are tax deferred and withdrawals are tax free when used for qualified educational expenses.

[17] There was testimony from the defendant and an itemization on his financial affidavit that each of the children already had a § 529 plan with $10,000 invested into it, for which the defendant served as trustee.

[18] General Statutes § 46b-56c (c) provides: "The court may not enter an educational support order pursuant to this section unless the court finds as a matter of fact that it is more likely than not that the parents would have provided support to the child for higher education or private occupational school if the family were intact. After making such finding, the court, in determining whether to enter an educational support order, shall consider all relevant circumstances, including: (1) the parents' income, assets and other obligations, including obligations to other dependents; (2) the child's need for support to attend an institution of higher education or private occupational school considering the child's assets and the child's ability to earn income; (3) the availability of financial aid from other sources, including grants and loans; (4) the reasonableness of the higher education to be funded considering the child's academic record and the financial resources available; (5) the child's preparation for, aptitude for and commitment to higher education; and (6) evidence, if any, of the institution of higher education or private occupational school the child would attend."

[19] General Statutes § 46b-66 (a) provides in relevant part: "If [an] agreement is in writing and provides for the care, education, maintenance or support of a child beyond the age of eighteen, it may also be incorporated or otherwise made a part of any such order and shall be enforceable to the same extent as any other provision of such order or decree . . . ." The parties in the present case entered into no such agreement.

[20] As the Riverside house has been ordered sold, the children are not going to have the benefit of residing in a home in which the costs of renovations were funded, in part, with their assets.

[21] General Statutes § 46b-56 (a) provides in in relevant part: "In any controversy before the Superior Court as to the custody or care of minor children . . . the court may make . . . any proper order regarding . . . support of the children . . . ."

General Statutes § 46b-84 provides in relevant part: "(a) Upon or subsequent to the . . . dissolution of any marriage or the entry of a decree of . . . divorce, the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. . . . (d) In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and

sources of income, vocational skills, employability, estate and needs of the child.''

[22] The court endeavored to ensure future educational support in other ways as well. It ordered the defendant to maintain health insurance for each child and to maintain group term life insurance naming the plaintiff and the children as beneficiaries for as long as he has an obligation to pay child support or postmajority educational support. In addition, it ordered that any § 529 plans previously established by the defendant "shall remain in full force and effect.''

[23] We infer that the court chose the plaintiff as the trustee for the § 529 plans because the money restored in the plans for the benefit of the children had come from her mother, and because it described the defendant's postseparation spending as "uncharacteristically lavish,'' and found that the defendant had violated the automatic orders. On the basis of the foregoing, it reasonably may have concluded that the plaintiff, who now assumes a fiduciary duty, would be the party best capable of handling the funds responsibly.

[24] We reject the defendant's claim that the court entered an improper educational support order pursuant to § 46b-56c (c). The court's order merely reserving jurisdiction to enter an educational support order in the future is clear and unambiguous. In *Greenan* v. *Greenan*, 150 Conn. App. 289, 91 A.3d 909, cert. denied, 314 Conn. 902, 99 A.3d 1167 (2014), this court held that, "[a]lthough [§] 529 accounts pertain to education expenses . . . [§] 529 accounts were not educational support orders pursuant to § 46b-56c.'' Id., 310. As in *Greenan*, the court's order in the present case with respect to the § 529 plans did not require the defendant or the plaintiff to provide support in the future should the children attend a postsecondary educational program.

[25] The plaintiff testified that her mother "gave $30,000 [to] each child that we spent. It was not to us. We have nothing. We are not allowed to touch that money. She was very clear about that. It's presents to the kids.''

[26] Practice Book § 25-5 provides in relevant part: "The following automatic orders shall apply to both parties, with service of the automatic orders to be made with service of process of a complaint for dissolution of marriage . . . . (b) In all cases involving a marriage . . . whether or not there are children: (1) Neither party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action.'' In the present case, the service of process included the service of the automatic orders.

[27] We are using the term employed by the court, "cryptocurrency,'' although there are references in the record to "virtual currency'' and "Bitcoin.''

[28] There were representations made to the court by the plaintiff and her counsel that the parties appeared in court numerous times to argue pretrial motions and the court was never able to accommodate them for a hearing due to time constraints and for other reasons.

[29] Although we have concluded that the contempt finding related to the ski lodge rental must be set aside, for the reasons that follow, we conclude that the court's remedial order related to the ski lodge rental nonetheless was appropriate and is left undisturbed.

[30] We also observe that this is not a case in which the court *based* its alimony and child support awards on a minimal earning capacity that it had attributed to the plaintiff, although the court, after considering the amounts the plaintiff had been paid for bookkeeping and photography by her friends, did mention that her earning capacity as of the date of the dissolution was, in fact, "minimal.'' The defendant's reliance on *Tanzman* v. *Meurer*, 309 Conn. 105, 70 A.3d 13 (2013), is therefore misplaced. In *Tanzman*, our Supreme Court held that when a trial court has based alimony or child support awards on a party's earning capacity, the court must determine the specific dollar amount of the party's earning capacity. Id., 107–108.

[31] General Statutes § 46b-62 (a) provides in relevant part: "In any proceedings seeking relief under the provisions of this chapter . . . the court may order either spouse or, if such proceedings concerns the custody, care, education, visitation or support of a minor child, either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82.''

[32] The defendant does not contest the reasonableness of the attorney's fees incurred by the plaintiff.

[33] On January 8, 2019, the defendant filed a motion for counsel fees pen-

dente lite, but the court ordered that he would be responsible for his own fees and costs in its memorandum of decision. In an updated affidavit of services, the defendant's counsel, Attorney Paul H. McConnell, of the McConnell Family Law Group, LLC, averred that from November 1, 2017 to January 8, 2019, his law firm, and the law firm of Schoonmaker, George, Colin & Blamberg, P.C., had rendered $213,191.88 in services and expense advances on behalf of the defendant. At a hearing concerning the plaintiff's motion for postjudgment counsel fees and appellate fees, the defendant testified that he had advanced the law firm of Pullman & Comley, LLC, a $35,000 retainer to represent him on appeal and had also paid that firm $15,000 in fees for continuing postdissolution matters.

[34] The court was aware of the prior decision by Judge Colin, determining that the defendant had unilaterally spent a disproportionate amount of his 2017 net bonus without first consulting with the plaintiff. See footnote 6 of this opinion.

[35] The regular parenting plan attached as Schedule A to the court's memorandum of decision, mentions that a parent who is "not current . . . on their . . . share of qualified, work related child care . . . expenses . . . shall forfeit their right to claim the minor children as a dependent that year. . . . ." However, nowhere does the memorandum of decision designate any shared obligation of the parents for qualified, work related child care. The court ordered that the parties share equally the cost of extracurricular and school related activities but, in that provision, does not refer to qualified work related child care.

[36] See footnote 4 of this opinion.

———————————————————